Jason L. Lichtman (18770)
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
New York, NY 10013
(212) 355-9500
jlichtman@lchb.com

*Attorney for Plaintiff and the Proposed Class*
*(additional counsel on signature page)*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **CIARA BROWN**, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>**INSTRUCTURE, INC.**,<br><br>*Defendant*. | Case No.: 2:26-cv-399<br><br>**CLASS ACTION COMPLAINT**<br><br>**PROPOSED CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ciara Brown ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant Instructure, Inc. ("Instructure" or "Defendant") individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions and upon information and belief and her counsel's investigation as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This class action arises out of a targeted cyberattack and data breach (the "Data Breach") caused  by Instructure's failure to secure and safeguard the personal identifying information ("PII") of approximately 275 million individuals, including their names, email addresses, student ID numbers, and private messages stored on Instructure's Canvas learning

management system ("LMS").[1] Affected individuals include minor students, school and school district employees, and other Canvas users at educational institutions around the world.[2]

2.      Shortly after Instructure disclosed the Data Breach, on May 3, 2026, ShinyHunters, an infamous group of ransom hackers responsible for numerous cyberattacks, including another significant data hack in the education sector (PowerSchool), claimed credit for the Data Breach.[3] ShinyHunters' post boasted that the stolen data contained the personal conversations and PII of students, teachers, and other individuals from nearly 9,000 educational institutions worldwide.[4] The scale and scope of this unauthorized access alone is clear evidence that Instructure failed to take reasonable steps to protect Plaintiff's and Class Members' PII.

3.      This was not the end of the story, however. Instructure's failure to remediate the Data Breach culminated in a second public intrusion (and its third overall) by the same threat actor on May 7, 2026 (the "May 7 Attack"). On that day—during final exam periods at universities across the United States—ShinyHunters defaced Canvas login pages displayed to students and teachers, posting a message that read, "ShinyHunters has breached Instructure (again)," together with the statement: "Instead of contacting us to resolve it they ignored us and did some 'security

---

[1] *Confirmed Security Incident*, INSTRUCTURE (May 2, 2026), https://status.instructure.com/.
[2] Ionut Arghire, *EdTech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, SECURITY WEEK (May 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/.
[3] *Id.*
[4] *Id.*

patches.'"[5] The attackers gave Instructure and the affected schools until May 12, 2026 to pay a

ransom to prevent ShinyHunters from leaking the stolen data.



**Figure 1: Image of defaced Canvas login page from University of Texas San Antonio. Lawrence Abrams, *Canvas login portals hacked in mass ShinyHunters extortion campaign*, Bleeping Computer (May 7, 2026), https://www.bleepingcomputer.com/news/security/canvas-login-portals-hacked-in-mass-shinyhunters-extortion-campaign/.**

4.      Instructure's failure to protect Plaintiff's and Class Members' PII is particularly

alarming because the Data Breach was foreseeable in light of similar attacks on the education

---

[5] *See* Lily Hay Newman, *The Canvas Hack Is a New Kind of Ransomware Debacle*, Wired (May 8, 2026), https://www.wired.com/story/canvas-hack-shinyhunters-ransomware-instructure/; *Developing: ShinyHunters Hacks Instructure Again; Canvas Down*, DataBreaches.net (May 7, 2026), https://databreaches.net/2026/05/07/developing-shinyhunters-hacks-instructure-again-canvas-down/.

sector by ShinyHunters and other cybercriminal groups. The PowerSchool data breach—involving tens of millions of minor children, parents, and school personnel and the payment of a multi-million-dollar ransom—has been widely publicized since December 2024 and was the subject of congressional hearings and a public CrowdStrike investigative report. The value of student data stored in LMS platforms was thus made plain well before the Data Breach. Instructure therefore knew or should have known that its data security created a heightened risk of exfiltration, compromise, and theft, yet it failed to act.

5.      PowerSchool reportedly paid a ransom of approximately $2.85 million to its attackers in December 2024. The widely reported payment, and the public reporting of the same group's continued extortion of educational technology vendors, put Instructure on notice not only of the threat but of the criminal incentive to target ed-tech vendors holding student data.[6]

6.      Notably, ShinyHunters **had previously breached Instructure's systems in September 2025**[7] and obtained customer data. Months later, the same group exploited the same or similar vulnerabilities to access Instructure's internal systems and exfiltrate terabytes of data, equivalent to hundreds of millions of records and billions of private messages. Instructure's security practices were therefore deficient, and Instructure failed to anticipate and adapt to a known threat.

---

[6] *See* Greg Noone, *The largest education data breach in history was not an attack on a school. It was an attack on a vendor*, The Next Web (May 7, 2026), https://thenextweb.com/news/the-largest-education-data-breach-in-history-was-not-an-attack-on-a-school-it-was-an-attack-on-a-vendor.

[7] *Instructure Discloses Cybersecurity Incident Affecting Canvas Platform*, Ciphers Security (May 2, 2026), https://cipherssecurity.com/instructure-canvas-security-incident-2026/; *Instructure Data Breach Exposes Canvas Users After ShinyHunters Attack*, Secure.com (May 4, 2026), https://www.secure.com/news/instructure-canvas-data-breach-shinyhunters?utm.

7.      ShinyHunters' track record was, by the time of the Data Breach, both extensive and notorious. The group has claimed responsibility for some of the largest data thefts of the past several years, including the 2024 Ticketmaster breach exposing approximately 560 million customer records and the 2024 AT&T breach affecting approximately 110 million customers, for which AT&T reportedly paid a ransom of approximately $370,000. In March 2026, the group claimed responsibility for the theft of approximately 350 gigabytes of data from the European Commission. The group's prominence is such that the U.S. Department of Justice in 2024 secured the conviction of an alleged member, Sebastien Raoult, who was sentenced to three years in prison and ordered to pay $5 million in restitution.[8]

8.      In the face of these highly publicized and well-known events, Instructure continues to market its Canvas product as a secure platform for K-12 schools, higher education institutions, and other organizations. Instructure's business revolves around, and depends upon, receiving and maintaining sensitive PII from students, their families, and school and school district personnel. Indeed, as a result of a student's enrollment and participation at an educational institution or by a condition of employment with a school or school district, millions of individuals are required to input or have their PII input into Canvas simply because the educational institution utilizes Canvas. Instructure profited from collecting, storing, and using this information but failed to implement and maintain reasonable and appropriate data security safeguards to protect it, despite representing it would do so.

---

[8] *See* Greg Noone*, The largest education data breach in history was not an attack on a school. It was an attack on a vendor*, The Next Web (May 7, 2026), https://thenextweb.com/news/the-largest-education-data-breach-in-history-was-not-an-attack-on-a-school-it-was-an-attack-on-a-vendor; Olivia B. Waxman, *What to Know About the Canvas Cyberattack*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know/.

9.  The data collected and maintained by Instructure includes: names, email addresses, student ID numbers, phone numbers, social media profile links, "descriptive information," and assessment records.[9] Plaintiff's and Class Members' sensitive PII—which was entrusted to Instructure for safekeeping—was compromised and unlawfully accessed in the Data Breach.

10.  Companies, like Instructure, entrusted with this type of sensitive information are required—by state and federal law—to take steps to protect it. Instructure knows this, which is why it represents through its privacy policies, practices, and postings on its website that it actively took steps to protect the PII in its care. For example, Instructure's website affirms that "[w]e protect the information we receive *by ensuring it's used only to support students, institutions, and education*."[10] Instructure further represents that "*[w]e believe that privacy is a fundamental human right* and take our responsibility very seriously. We are committed to protecting your privacy and have a dedicated privacy and security program. *Our customers (educational institutions and companies) entrust us as data stewards for their users' information*."[11]

11.  The Data Breach was the direct result of Instructure's failure to adequately maintain network security for the Canvas platform and the software its customers used, rendering its data systems easy prey for cybercriminals.

12.  Instructure owed a non-delegable duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII. Instructure recognizes this. For example, in a blog post entitled Our Foundation of Privacy,

---

[9] Institutions & Educators Privacy | FAQ, Instructure, https://www.instructure.com/privacy-security/institutions-educators-faq#:~:text=System%20Data,technical%20and%20system%20analytics%20purposes (Accessed May 8, 2026).

[10] Privacy, Instructure, https://www.instructure.com/privacy-security (Accessed May 8, 2026).

[11] Welcome to the Instructure Privacy Notice Center, Instructure, https://www.instructure.com/privacy-center (Accessed May 8, 2026).

Instructure represented that ***"[p]rivacy and the protection of personal and customer information are of paramount importance. Cyberattacks and I.D. theft can alter lives***. The privacy and usage of data is appropriately in discussion in nearly every industry. Instructure takes its responsibility of protecting your data seriously. . . . ***Instructure protects personal information and continuously takes measures to keep it safe***."[12] Despite its public representations, Instructure negligently or recklessly maintained PII and allowed unauthorized persons to access it for criminal purposes.

13.     Armed with the PII accessed in the Data Breach, data thieves can commit (and in some cases have already committed) a variety of crimes including: opening new financial accounts and taking out loans in Class Members' names, using Class Members' names to obtain medical services and medical insurance, using Class Members' PII to target other phishing and hacking intrusions, using Class Members' PII to obtain government benefits, and filing fraudulent tax returns using Class Members' PII.

14.     As a result of the Data Breach, in addition to actual harm, such as fraud and identity theft, Plaintiff and Class Members face a clear and present risk of imminent and certainly impending harm, including, but not limited to, a loss of their valuable data, time and opportunity costs, and mitigation expenses over the misuse of their PII.

15.     Even those Class Members who have not yet experienced identity theft have spent valuable time responding to the Data Breach and now face an immediate and heightened risk of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred, and will continue to incur, damages including identity theft, attempted identity theft, lost time and mitigation expenses, increased risk of harm, damaged credit, diminished value of PII,

---

[12] https://www.instructure.com/resources/blog/our-foundation-privacy

loss of privacy, benefit-of-the-bargain damages, nominal damages, and other damages described below.

16. Accordingly, Plaintiff brings this action against Instructure, seeking redress for its unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) invasion of privacy/intrusion upon seclusion; (iv) declaratory judgment; (v) breach of implied contract; (vi) unjust enrichment; and (vii) violation of state consumer protection laws. Through these claims, Plaintiff seeks damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including improvements to Instructure's data security systems, policies, and practices, future annual audits, and adequate credit monitoring services funded by Instructure.

## PARTIES

17. Plaintiff Ciara Brown is a citizen and resident of Hinds County, Mississippi.

18. Between 2022 and 2023, Plaintiff Brown was enrolled as a student at Hinds Community College and, between 2024 and 2025, Plaintiff Brown was enrolled as a student at Holmes Community College.

19. At both institutions, Plaintiff Brown was required to use Canvas to participate in the courses in which she was enrolled.

20. At all relevant times Plaintiff Brown was required to provide her PII to Instructure to use Canvas. On information and belief, Instructure retained Plaintiff Brown's PII in its systems at the time of the Data Breach.

### Defendant

21. Defendant Instructure, Inc. is a Delaware corporation with its principal place of business located at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiff, and at least one member of the putative Class, as defined below, are citizens of a different state than Instructure, there are more than 100 putative Class Members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

23.     This Court has general personal jurisdiction over Instructure because Instructure has its principal place of business in this District. Additionally, specific personal jurisdiction exists here because Instructure regularly transacts business in this District and has directed many of the acts and omissions complained of herein in this District, thereby purposefully availing itself of the forum.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Instructure's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Instructure has harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

### *Instructure's Business and Security Promises*

25.     Instructure is a leading education technology company best known for its Canvas LMS, which thousands of K–12 school districts, colleges, universities, and other educational institutions use to manage coursework, assignments, grades, communications, and other aspects of online and blended learning.

26.     Canvas is the dominant LMS in higher education in North America, with a market share of approximately 41% of higher-education institutions, and Instructure reports that its

9

products are used by approximately 200 million learners across more than 100 countries, including more than 30 million active users.[13]

27.      Instructure's customers include educational institutions across the United States and around the world. Through Canvas, Instructure handles highly sensitive data relating to students, teachers, and staff, including:

     a.  Names;

     b.  Dates of birth;

     c.  Addresses or other location information;

     d.  Email addresses;

     e.  Student and employee identification numbers;

     f.  IP addresses;

     g.  Persistent or unique device identifiers;

     h.  Phone numbers; and

     i.  Gender or preferred pronouns.[14]

28.      In the regular course of its business, Instructure collects and maintains the PII of Canvas users, whether provided directly by the user or through the learning institution with which the user is affiliated. Instructure required Plaintiff and Class Members to provide their PII as a condition of receiving products and services from Instructure.[15]

---

[13] *See* Greg Noone, *The largest education data breach in history was not an attack on a school. It was an attack on a vendor*, The Next Web (May 7, 2026), https://thenextweb.com/news/the-largest-education-data-breach-in-history-was-not-an-attack-on-a-school-it-was-an-attack-on-a-vendor; Olivia B. Waxman, *What to Know About the Canvas Cyberattack*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know/.
[14]   *Product   Privacy   Notice*, INSTRUCTURE   (effective   date   Oct.   31,   2025), https://www.instructure.com/policies/product-privacy-policy.
[15]   *Id.*

29.    Instructure markets Canvas as a trusted, reliable, and secure platform. In doing so, Instructure implicitly and explicitly acknowledges the sensitivity and confidential nature of the data it collects and stores and represents that it takes the security and privacy of that data seriously.

30.    Instructure is well aware that student data and educational records are subject to heightened privacy expectations and regulatory obligations, and that exposure of such data can cause severe and long-lasting harms to affected individuals, particularly minors.

31.    Instructure holds itself out as a company where "[s]ecurity is built into the fabric of our cloud platform, infrastructure, and processes, so you can rest assured that your data is safeguarded."[16] Instructure claims compliance with SOC 2 and ISO 27001 security standards, active security monitoring for threats, and encryption of data in transit and at rest.[17] Instructure also operates vulnerability disclosure and bug bounty programs and touts its use of the Amazon Web Services' logging and detection capabilities to identify potential vulnerabilities or unauthorized access.[18] In its Privacy Policy, Instructure also promises to take "reasonable steps to help protect your personal information in an effort to prevent unauthorized access, use, or disclosure."[19]

### Defendant is Obligated to Comply with FERPA and COPPA

32.    The Family Educational Rights and Privacy Act ("FERPA") and its implementing regulations protect education records from unauthorized disclosure and require institutions in

---

[16] *Enterprise Security*, INSTRUCTURE, https://www.instructure.com/trust-center/security (last accessed May 5, 2026).

[17] *Id.*

[18] *Id.*

[19] *Product Privacy Notice*, INSTRUCTURE (effective date Oct. 31, 2025), https://www.instructure.com/policies/product-privacy-policy.

possession of those records to maintain reasonable security.[20] Education records may include, but are not limited to: transcripts, class lists, student course schedules, health records, student financial information, and student disciplinary records, and FERPA applies to records maintained by third parties acting on behalf of an educational institution.[21]

33.    Instructure is also subject to the Children's Online Privacy Protection Act ("COPPA"), as evidenced by its COPPA privacy policy.[22] COPPA applies to the collection of personal information about children under the age of 13, where "personal information" includes, among other things: "first and last name;" "online contact information" of any kind, including a "screen or user name"; "a persistent identifier" such as IP address or unique device identifier; and "[a] photograph, video, or audio file where such file contains a child's image or voice."[23] In addition to requiring verifiable parental consent before collecting this personal information, COPPA implementing regulations require covered entities to retain personal information "for only as long as is reasonably necessary to fulfill the specific purpose(s) for which the information was collected" and to "delete the information using reasonable measures to protect against unauthorized access to, or use of, the information in connection with its deletion."[24] These

---

[20]   *Responsibilities of Third-Party Service Providers under FERPA*, PRIVACY TECHNICAL ASSISTANCE CENTER (Aug. 2015), https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Vendor%20FAQ.pdf.

[21] *Id.*; Lauren N. Watson and Evan J. Yahng, *President Trump Orders Closure of the Department of Education: What Schools and EdTech Companies Need to Know About FERPA*, OGLETREE DEAKINS (Apr. 14, 2025), https://ogletree.com/insights-resources/blog-posts/president-trump-orders-closure-of-the-department-of-education-what-schools-and-edtech-companies-need-to-know-about-ferpa/.

[22] *Instructure COPPA Privacy Policy*, INSTRUCTURE (effective date Apr. 1, 2021), https://www.instructure.com/policies/coppa-privacy.

[23] 16 CFR 312.2.

[24] 16 CFR 312.10.

regulations also require covered entities to have a written data retention policy setting out their data retention and deletion practices.[25]

34.    Due to the highly sensitive and personal nature of the information acquired and stored, Instructure knew or reasonably should have known it needed to comply with educational industry standards related to data security and all federal and state laws and regulations protecting students' PII. It also had a duty to provide adequate notice to customers if their PII was disclosed without proper authorization.

35.    Instructure could have prevented or mitigated the effects of the Data Breach—indeed, it was required to—by ensuring it had implemented and followed appropriate data security measures or by better selecting its business associates to whom it intended to and did disclose PII. Its failure to do so constitutes a breach of its duties under FERPA and COPPA, resulting in the exposure of Plaintiff's and Class Members' sensitive information.

***The Data Breach***

36.    On May 1, 2026, Instructure publicly disclosed it had suffered a cybersecurity incident and that data had been stolen in connection with an attack on its systems. While Instructure has provided almost no information about the nature of the attack that led to the Data Breach, on April 30, 2026, it also publicly reported a service disruption "to tools relying on API keys,"[26] or keys that allow two computer programs to communicate with one another on the internet,[27] strongly indicating this was the access point that allowed the attackers to access Canvas. On information and belief, the precise vector exploited in the Data Breach was Instructure's "Free-

---

[25] *Id.*

[26] *Confirmed Security Incident*, Instructure (May 1, 2026), https://status.instructure.com/.

[27] *What is an API Key? Working and Types*, GEEKSFORGEEKS (July 23, 2025), https://www.geeksforgeeks.org/software-engineering/what-is-api-key/.

For-Teacher" account program, a free account offering open to teachers worldwide. In a public statement, Instructure acknowledged that "the unauthorized actor exploited an issue related to our Free-For-Teacher accounts" and shut those accounts down to restore service.[28]

37.    Almost immediately, the extortion group ShinyHunters claimed responsibility for the attack on its data leak site, claiming it accessed Instructure's data through a vulnerability in Instructure's systems.[29] Specifically, the hackers claimed to use "Canvas data export features, including DAP queries, provisioning reports, and user APIs" to exfiltrate the data.[30]

38.    ShinyHunters also asserted that: nearly 9,000 schools worldwide were affected; data relating to approximately 275 million individuals—including students, teachers, and staff— was stolen; and the stolen dataset contained several billion private messages among students and teachers and between students and other students.[31]

---

[28] *See* Olivia B. Waxman, *What to Know About the Canvas Cyberattack*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know/.
[29] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, MSN (May 5, 2026), https://www.msn.com/en-us/money/other/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ar-AA22rKmg?ocid=BingNewsSerp.
[30] Lawrence Abrams, *Instructure confirms data breach, ShinyHunters claims attack*, BLEEPINGCOMPUTER (May 3, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/.
[31] *Id.*

39.     ShinyHunters' post included a "final warning" that Instructure needed to pay a ransom or ShinyHunters would leak the data. ShinyHunters also sent Instructure a ransom letter on May 3, 2026, in which it threatened to release the stolen data within days.[32] While ShinyHunters' leak timeline has shifted, its extortion tactics have escalated,[33] evidencing clear intent to release Plaintiff's and Class Members' PII. A member of ShinyHunters has shared sample data with a journalist that indicates names, email addresses, and phone numbers were impacted, as well as private messages sent on Canvas.[34] ShinyHunters has also publicly released a list of all affected institutions, and on May 7, 2026, again hacked Canvas to post a message on the Canvas



**Figure 2: Screen capture of ShinyHackers' announcement. Ionut Arghire, *EdTech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, Security Week (May 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/.**

---

[32] *See* Olivia B. Waxman, *What to Know About the Canvas Cyberattack*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know/.
[33] *Id.*
[34] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, MSN (May 5, 2026), https://www.msn.com/en-us/money/other/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ar-AA22rKmg?ocid=BingNewsSerp.

platform itself and demand a ransom (discussed *infra*).[35] Plaintiff and Class Members therefore have reason to believe their PII and private messages have been or will be imminently published on the dark web or otherwise further disclosed and disseminated to unknown parties who intend to misuse this sensitive and highly personal information.

40.     This was the second time that Instructure has been successfully attacked by ShinyHunters specifically in the past year.[36] Instructure therefore knew or should have known to be on high alert for exactly this kind of targeted attack. That ShinyHunters was able to access Instructure's systems for multiple times indicates the hackers were able to exploit the same or similar vulnerabilities just months after a successful attack to get deeper into Instructure's networks and extract more data.[37]

41.     The PII compromised in the Data Breach was highly sensitive, confidential, and in some cases immutable. According to Instructure, the compromised data included: first names, last names, email addresses, and student ID numbers, as well as user messages.[38] While Instructure asserted on May 2, 2026, that no other information was involved "[a]t this time," given the volume of information exposed in various forms, it is unlikely that Instructure has a clear grasp of the extent of the PII belonging to or associated with Plaintiff and Class Members that has been stolen.[39] Indeed, the sample ShinyHunters shared with a journalist indicated at least some phone numbers

---

[35] *See* Olivia B. Waxman, *What to Know About the Canvas Cyberattack*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know/.

[36] *Instructure Discloses Cybersecurity Incident Affecting Canvas Platform*, Ciphers Security (May 2, 2026), https://cipherssecurity.com/instructure-canvas-security-incident-2026/; *Instructure Data Breach Exposes Canvas Users After ShinyHunters Attack*, Secure.com (May 4, 2026), https://www.secure.com/news/instructure-canvas-data-breach-shinyhunters?utm.

[37] Ionut Arghire, *EdTech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, SECURITY WEEK (May 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach.

[38] *Confirmed Security Incident*, Instructure (May 1, 2026), https://status.instructure.com/.

[39] *Id.*

were obtained,[40] and other reporting indicates the presence of user records and enrollment data in the stolen dataset as well.[41]

42.     The private messages exposed in the Data Breach are particularly sensitive. Canvas's messaging functions are routinely used by students and their families to communicate confidentially with academic advisers, accommodations and disability-services personnel, mental-health and medical providers, and Title IX advocates and investigators, often disclosing medical conditions, mental-health information, requests for accommodations, and reports of sexual harassment or assault.[42] The exfiltration of billions of such messages thus exposes Plaintiff and Class Members to harms well beyond the misuse of names, email addresses, and student ID numbers.

43.     Upon information and belief, the compromised PII was accessible, unencrypted, unprotected, and vulnerable for acquisition or exfiltration by the unauthorized threat actor, all in violation of myriad duties Instructure owed under state and federal statutory and common law.

44.     To date, most affected individuals have not been notified that their PII was compromised in the Data Breach. As a result, Plaintiff and Class Members will continue to face a substantial and concrete risk that their identities will be (or have already been) stolen and misused.

---

[40] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, MSN (May 5, 2026), https://www.msn.com/en-us/money/other/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ar-AA22rKmg?ocid=BingNewsSerp.

[41] Lawrence Abrams, *Instructure Hacker Claims Data Theft from 8,800 Schools, Universities*, BLEEPING COMPUTER (May 5, 2026), https://www.bleepingcomputer.com/news/security/instructure-hacker-claims-data-theft-from-8-800-schools-universities/.

[42] *See Hackers breach Canvas learning platform, expose data of millions of students and teachers*, KING5 (May 7, 2026), https://www.king5.com/article/news/nation-world/canvas-hack-shinyhunters-schools-students-teachers-data-exposed/507-0f3f5973-3d68-45af-b309-666561b2bd87.

45.     Instructure's failure to remediate the Data Breach culminated in the May 7 Attack, ShinyHunters' third breach of Instructure's systems. On that day—during final exam periods at universities across the United States—ShinyHunters defaced Canvas login pages displayed to students and teachers, posting a message that read, "ShinyHunters has breached Instructure (again)," together with the statement: "Instead of contacting us to resolve it they ignored us and did some 'security patches.'"[43]

46.     In response to the May 7 Attack, Instructure was forced to put Canvas, Canvas Beta, and Canvas Test into "maintenance mode," rendering the platform inaccessible during a critical academic period. Multiple universities, including Penn State, the University of Illinois, and James Madison University, reportedly cancelled scheduled exams and assignment deadlines, and the entire University of California system instructed its campuses to block or redirect Canvas access. Other institutions including Columbia, Harvard, Georgetown, Rutgers, and the University of Chicago issued similar advisories.[44]

### Instructure Failed to Comply with FTC Guidelines and Industry Standards

47.     According to the Federal Trade Commission ("FTC"), the needs for data security should be factored into all business decision-making.[45] To that end, the FTC has issued numerous

---

[43] *See* Lily Hay Newman, *The Canvas Hack Is a New Kind of Ransomware Debacle*, Wired (May 8, 2026), https://www.wired.com/story/canvas-hack-shinyhunters-ransomware-instructure/; *Developing: ShinyHunters Hacks Instructure Again; Canvas Down*, DataBreaches.net (May 7, 2026), https://databreaches.net/2026/05/07/developing-shinyhunters-hacks-instructure-again-canvas-down/.

[44] *See* Olivia B. Waxman, *What to Know About the Canvas Cyberattack*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know/;   Lily Hay Newman, *The Canvas Hack Is a New Kind of Ransomware Debacle*, Wired (May 8, 2026), https://www.wired.com/story/canvas-hack-shinyhunters-ransomware-instructure/.

[45] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015) ("*Start with Security*"), https://bit.ly/3uSoYWF.

guidelines identifying best data security practices that businesses like Instructure should employ to protect against unlawful exfiltration of PII.

48.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for businesses.[46] The guidelines explain that businesses should:

(a)    protect the personal customer information that they keep;

(b)    properly dispose of personal information that is no longer needed;

(c)    encrypt information stored on computer networks;

(d)    understand their network's vulnerabilities; and

(e)    implement policies to correct security problems.

49.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from their systems and that they have a response plan ready in the event of a breach.

50.    The FTC recommends that companies not maintain PII longer than needed for authorization of a transaction; properly dispose of personal information no longer needed; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network to uncover unapproved activity; verify that privacy and security features function properly; update and patch third-party software; and verify that third-party service providers have implemented reasonable security measures.[47]

---

[46]    *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre.

[47]    *See Start with Security, supra* note 45.

51.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.     These FTC enforcement actions include actions against entities, like Instructure, entrusted with vast swaths of consumers' PII.[48]

53.     Accordingly, since these and similar actions were initiated prior to the Data Breach, Instructure knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to or theft of PII and further clarified the measures Instructure should have taken to meet its data security obligations.

54.     Instructure's failure to employ reasonable and appropriate measures to protect against unauthorized access to its customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

55.     Further, Instructure made a public commitment to maintain a high level of privacy and security for the student data it collects and maintains, binding itself to comply with certain reasonable standards of data security and acknowledging its failure to do so would violate Section 5 of the FTC Act, through the Future of Privacy Forum's Student Privacy Pledge ("SPP").[49]

---

[48]  *See, e.g.*, *In re LabMD, Inc.*, 2016 WL 4128215, at *32 (FTC July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

[49]  Product Privacy Notice, Instructure (Oct. 31, 2025) https://www.instructure.com/policies/product-privacy-policy. While the Future of Privacy Forum announced it was "sunsetting" the SPP as of April 25, 2025, it noted "participating companies remain legally bound by Pledge commitments with regard to data collected during the period they

Among other things, Instructure committed to "not knowingly retain[ing] Student PII beyond the time period required to support the authorized educational/school purposes, or as authorized by the parent/student;" "maintain[ing] a comprehensive security program that is reasonably designed to protect the security, confidentiality, and integrity of Student PII against risks – such as unauthorized access or use, or unintended or inappropriate disclosure – through the use of administrative, technological, and physical safeguards appropriate to the sensitivity of the information"; and "requir[ing] that our vendors with whom Student PII is shared in order to deliver the educational service, if any, are obligated to follow these same commitments for the given Student PII."[50] An FAQ page explaining aspects of the SPP clarifies that signatories are required to have "[a]dministrative, technical, and physical safeguards . . . designed to protect against . . . external risks, such as a malicious hack or ransomware attack," and that a violation of the SPP's commitments was "an unfair or deceptive trade practice" in violation of Section 5 of the FTC Act.[51]

### The Experiences, Injuries, and Damages of Plaintiff and Class Members

56.    Plaintiff and Class Members have been damaged by the exposure and exfiltration of their PII in the Data Breach.

57.    Between 2022 and 2023, Plaintiff used Canvas as a student at Hinds Community College, and between 2024 and 2025, she used Canvas as a student at Holmes Community College.

---

were signatories." Student Privacy Pledge, Future of Privacy Forum https://fpf.org/student-privacy-pledge/ (accessed May 8, 2026).
[50]    Privacy    Pledge    2020,    Future    of    Privacy    Forum, https://web.archive.org/web/20230714110718/https:/studentprivacypledge.org/privacy-pledge-2-0/ (accessed May 8, 2026).
[51]    Guidelines    &    FAQs,    Future    of    Privacy    Forum, https://web.archive.org/web/20230711052826/https:/studentprivacypledge.org/faqs/    (accessed May 8, 2026).

To access Canvas and complete her coursework, Plaintiff had to provide her PII to Instructure. Plaintiff reasonably believed Instructure would protect that PII, and she would not have used Canvas through either institution had she known otherwise.

58.     Around the time Instructure disclosed the Data Breach, Plaintiff received notice of several unauthorized attempts to access her PayPal account. In the same timeframe, she has also learned that her PII was found on the dark web and has experienced a significant increase in spam and phishing calls and emails. Plaintiff has acted to reasonably mitigate the impact of the Data Breach by researching the breach, securing her passwords, and reviewing her credit report daily. She has spent significant time responding to the Data Breach and will continue to spend time she otherwise would have devoted to work, recreation, and other activities. The Data Breach has caused Plaintiff to lose time and suffer annoyance, interference, inconvenience, and increased concern about the loss of her privacy and the misuse of her PII.

59.     As a result of the Data Breach, Plaintiff faces a present and continuing risk of fraud and identity theft. She also has a continuing interest in ensuring that her PII, which on information and belief remains in Instructure's possession, is protected from future breaches.

60.     As a direct result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injury, including: (a) fraud and identity theft; (b) loss of control over their PII; (c) the compromise, disclosure, or theft of their PII; (d) out-of-pocket costs to prevent, detect, and recover from identity theft, fraud, or unauthorized use of their PII; (e) lost time and opportunity costs spent addressing and mitigating the consequences of the Data Breach; (f) costs associated with credit monitoring and freezes; (g) an increased risk of further unauthorized disclosure while Instructure retains their PII without adequate safeguards; (h) continuing expenditures of time, effort, and money to prevent, detect, contest, and repair the effects of the

Data Breach; (i) diminution in the value of their PII; and (j) overpayment for services received without adequate data security.

61.     To date, Instructure has done nothing to provide Plaintiff and Class Members with adequate relief for the damages they have suffered as a result of the Data Breach.

62.     Plaintiff and Class Members also have an interest in ensuring that Instructure adequately secures the PII it continues to possess against further breaches.

*63.*     As a result of Instructure's conduct, Plaintiff and Class Members face continuing anxiety, embarrassment, and privacy harms arising from the exposure and threatened disclosure of their PII.

***Plaintiff and Class Members Face Significant Present and Continuing Risk***

64.     Identity theft occurs when a person uses another's personal information without permission to commit fraud or other misconduct.

65.     According to experts, one out of four data breach notification recipients becomes a victim of identity fraud.[52]

66.     Because Instructure failed to prevent and timely detect the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer monetary loss, lost time, mitigation costs, diminished control over their PII, and an increased risk of fraud and identity theft.

67.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Prey, a company that develops device tracking and recovery software, stolen PII can be worth up to $2,000 depending on the type of information obtained.[53]

---

[52] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, THREATPOST (Feb. 21, 2013), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.
[53] Juan Hernandez, *The Lifecycle of Stolen Credentials on the Dark Web*, PREY (Feb. 26, 2024), https://preyproject.com/blog/lifecycle-stolen-credentials-dark-web.

68.     Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[54]

69.     The value of Plaintiff's and Class Members' PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various dark web internet websites, making the information publicly available, for a substantial fee.

70.     There may be time lags between when PII is stolen, when it is used, and when a person discovers it has been used. On average, it takes about three months for consumers to discover that their identity has been stolen and used, but it takes some people up to three years to learn that information.[55]

71.     Plaintiff and Class Members have good reason to fear these consequences. ShinyHunters has publicly announced its intention to disclose the exfiltrated data on the dark web[56] and has a documented track record of publishing or selling stolen data.[57] A member of

---

[54] Federal Trade Commission, *What to Know About Identity Theft* (Apr. 2021), https://www.consumer.ftc.gov/articles/what-know-about-identity-theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. §1022.3(h). "Identifying information" means "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. §1022.3(g).
[55] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS & INFORMATICS 9, 12 (2019), https://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.
[56] Lawrence Abrams, *Instructure Hacker Claims Data Theft from 8,800 Schools, Universities*, BLEEPING COMPUTER (May 5, 2026), https://www.bleepingcomputer.com/news/security/instructure-hacker-claims-data-theft-from-8-800-schools-universities/.
[57] *Why ShinyHunters Keeps Winning (And What Companies Keep Getting Wrong)*, SECURE.COM (May 4, 2026), https://www.secure.com/blog/cybersecurity/who-are-shinyhunters.

ShinyHunters has already shared sample data from multiple learning institutions with a journalist, including names, email addresses, phone numbers, and private Canvas messages.[58] Plaintiff and Class Members therefore have reason to believe their PII and private messages have been or will be further disclosed to unknown parties who intend to misuse that information.

72.    To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

73.    One such example of criminals using PII for profit is the development of "Fullz" packages, or dossiers on individuals.[59]

74.    Because criminals can combine stolen PII with other identifiers to create Fullz packages, even data points not taken in the breach can be matched, packaged, and reused for fraud. That is already happening to Plaintiff and Class Members.

75.    The increasing prevalence of data breaches and Internet-enabled crimes further demonstrates the risks and harms Plaintiff and Class Members have experienced and will experience as a result of this Data Breach.

---

[58] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, MSN (May 5, 2026), https://www.msn.com/en-us/money/other/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ar-AA22rKmg?ocid=BingNewsSerp.

[59] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, and date of birth. As a rule of thumb, the more information one has on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KREBS ON SECURITY (Sept. 18, 2014), https://krebsonsecurity.com/tag/fullz/.

76.    For example, in 2023, the number of data breaches in the United States reached 3,205, a 78% increase from 2022 and a 72% increase from 2021.[60]

77.    Additionally, according to the Federal Bureau of Investigation ("FBI"), in 2023, Internet-enabled crimes reached their highest number of complaints and dollar losses, resulting in more than $12.5 billion in losses to individuals and business victims.[61]

78.    Further, the FBI states that "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[62] Defendants did not rapidly report to Plaintiff and Class Members that their PII had been stolen.

79.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[63]

80.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, or experience financial losses resulting from fraudulently opened accounts or

---

[60] Identity Theft Resource Center, *2023 Annual Data Breach Report Reveals Record Number of Compromises, 72 Percent Increase Over Previous High*, https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited Aug. 2, 2024).
[61] Internet Crime Complaint Center, *2023 Internet Crime Report* (2023), https://www.ic3.gov/Media/PDF/AnnualReport/2023_IC3Report.pdf (last accessed Apr. 11, 2024).
[62] Internet Crime Complaint Center, *2019 Internet Crime Report Released* (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=Rapid%20reporting%20can%20help%20law,to%20build%20on%20its%20success.
[63] *See* Louis DeNicola, *What Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

misuse of existing accounts. Given that students and families may have used the billions of stolen Canvas messages to discuss medical conditions, mental-health information, and reports of sexual harassment or assault,[64] the Data Breach presents an acute risk of blackmail, extortion, and harassment by cybercriminals.[65]

81.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend considerable time repairing the damage caused by the theft of their PII.

82.    In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[66] Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank and credit accounts, open new ones, and dispute charges with creditors.

83.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[67]

---

[64] *See Hackers breach Canvas learning platform, expose data of millions of students and teachers*, KING5 (May 7, 2026), https://www.king5.com/article/news/nation-world/canvas-hack-shinyhunters-schools-students-teachers-data-exposed/507-0f3f5973-3d68-45af-b309-666561b2bd87

[65] *See, e.g.*, William Ralston, *They Told Their Therapists Everything. Hackers Leaked It All*, WIRED (May 4, 2021) https://www.wired.com/story/vastaamo-psychotherapy-patients-hack-data-breach/.

[66] *2023 Consumer Aftermath Report*, Identity Theft Resource Center (2023), https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf.

[67] Federal Trade Commission, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

84.     An active and robust consumer marketplace for PII also exists. The global data brokering industry in 2024 is worth about $389.765 billion.[68] The data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker, who in turn aggregates the information and provides it to marketers or app developers.[69]

85.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the stolen PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### Instructure Failed to Appropriately Maintain and Protect Plaintiff's and Class Members' PII

86.     Charged with handling highly sensitive PII, Instructure knew or should have known the importance of safeguarding the PII entrusted to it. Instructure also knew or should have known the foreseeable consequences of a breach of its data security systems, including the significant costs and other harms that would be imposed on Plaintiff and Class Members. Instructure nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

87.     Instructure failed to adequately protect Plaintiff's and Class Members' PII and allowed criminals unfettered access to this sensitive data to use in conducting criminal activity. Specifically, Instructure failed to adequately protect Plaintiff's and Class Members' PII from people engaged in disruptive and unlawful business practices and tactics, including online account

---

[68] Knowledge Sourcing Intelligence LLP, *Global Data Broker Market*, https://www.knowledge-sourcing.com/report/global-data-broker-market (last visited Aug. 2, 2024).
[69] *See* Datacoup, https://datacoup.com/ (last accessed July 18, 2024).

hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

88.    Instructure's use of outdated and insecure systems and software, and its failure to maintain adequate security measures, an up-to-date technology security strategy, and an employee training program, demonstrate a conscious disregard for the privacy of Plaintiff and millions of Class Members.

## CLASS ACTION ALLEGATIONS

89.    Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class (the "Class") defined as:

> **Nationwide Class:** All United States residents whose PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

90.    Plaintiff also brings certain claims on behalf of a state-based subclass (the "Mississippi Subclass") defined as:

> **Mississippi Subclass:** All Mississippi residents whose PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach (collectively, the "Mississippi Subclass Members").

91.    Excluded from the Class and the Mississippi Subclass are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class and the Mississippi Subclass are members of the judiciary to whom this case is assigned, their families and members of their staff.

92.    Class certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis utilizing the same evidence as would be used to prove those elements in separate actions alleging the same claims.

93.    *Numerosity.* The Class Members are so numerous that joinder of all Class Members would be impracticable. Upon information and belief, the Class consists of approximately 275 million individuals. Also, the Class is comprised of an easily ascertainable set of individuals and entities who were impacted by the Data Breach. The exact number and identity of Class Members can be confirmed through discovery, which includes Defendant's records.

94.    *Commonality.* Common questions of fact and law exist as to all Class Members and predominate over questions affecting only individual Class Members. These common questions of law or fact, include, among other things:

- whether Defendant's cybersecurity systems or protocols before and during the Data Breach complied with relevant data security laws, regulations, and industry standards;

- whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- whether Defendant owed a duty to Class Members to safeguard their PII;

- whether Defendant breached its duty to Class Members to safeguard their PII;

- whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

- whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

- whether Defendant's conduct was negligent; and

- whether Plaintiff and Class Members are entitled to damages, injunctive relief, or other equitable relief, and the extent of such damages and relief.

95.    *Predominance.* Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' PII was stored on the same network system and was unlawfully and inadequately protected in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above

30

predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

96.    ***Typicality.*** Plaintiff's claims are typical of the claims of the other members of the Class because, *inter alia*, all Class Members were similarly injured as a result of Defendant's uniform misconduct described herein and were accordingly subject to the same Data Breach.

97.    ***Adequacy of Representation.*** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class she seeks to represent, she retained counsel competent and experienced in complex class action litigation, and she will prosecute this action earnestly. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

98.    ***Superiority – Federal Rule of Civil Procedure 23(b)(3).*** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

99.    Class certification is also appropriate under Rules 23(b)(1) and (b)(2) because:

- The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications establishing conflicting standards of conduct for Defendant;

- The prosecution of separate actions by individual Class Members would create a risk of adjudication that would be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

- Defendant has acted and refused to act on grounds generally applicable to the Class, thereby making final injunctive relief regarding the members of the Class as a whole appropriate.

100. Class certification under Federal Rule of Civil Procedure 23(c)(4) is also appropriate because this Court can designate specific claims or issues for class-wide treatment and can designate multiple subclasses.

101. Defendant acted on grounds that apply generally to the Class as a whole, making injunctive or declaratory relief appropriate on a class-wide basis under Federal Rule of Civil Procedure 23(b)(2).

102. No unusual difficulties are likely to be encountered in the management of this action as a class action.

103. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

## CAUSES OF ACTION

### Claims Brought on Behalf of Plaintiff and the Class

### COUNT I

### NEGLIGENCE AND NEGLIGENCE PER SE

104. Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 103 as if fully set forth herein.

105. Plaintiff and Class Members had to submit their non-public PII through Instructure's Canvas platform to receive educational services from Instructure's institutional clients.

106. Plaintiff and Class Members reasonably expected Instructure to maintain their PII securely and to prevent cybercriminals from accessing or exfiltrating it.

107. Instructure owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in safeguarding, securing, and protecting the highly sensitive and confidential data it solicits, collects, stores, and maintains. This duty included a responsibility to implement processes to detect a breach of its security systems in a reasonably expeditious manner, to address and ameliorate the damage resulting from a data breach, and to give prompt notice to those affected in the event of a data breach.

108. Instructure's duty to use reasonable data security measures includes, among other things: (a) designing, maintaining, and testing its security protocols to ensure that the PII of Plaintiff and Class Members is adequately secured and protected; (b) removing or deleting sensitive data when no longer needed for authorized purposes; and (c) implementing and maintaining procedures to detect and prevent improper access to and misuse of Plaintiff's and Class Members' PII.

109. Instructure exercised control over the PII stored on its systems and networks; accordingly, Instructure was best positioned and most capable of preventing the harms caused by the Data Breach.

110. Plaintiff and Class Members could not assess Instructure's internal data security practices or protect their PII from the resulting vulnerabilities.

111. Instructure therefore knew or reasonably should have known that Plaintiff and Class Members relied on it to secure and protect their highly sensitive PII from unauthorized access and disclosure, establishing a special relationship between Instructure and Plaintiff and Class Members.

112. That special relationship gave rise to Instructure's duty to use reasonable measures to protect and secure Plaintiff's and Class Members' PII.

113. Instructure's failure to implement and maintain adequate data security created a foreseeable risk that Plaintiff's and Class Members' PII would be improperly accessed or disclosed to unauthorized third parties in a data breach.

114. Instructure knew the sensitivity of the PII it collected and the harm that would result if unauthorized parties compromised or disclosed it in a data breach.

115. Instructure had long known that electronic recordkeeping systems are prime targets for hackers.

116. Past breaches in the edtech industry, including a prior breach of Instructure by the same threat actor behind this Data Breach, put Instructure on notice that its data security practices were inadequate to safeguard Plaintiff's and Class Members' PII and that the risk of another breach was high.

117. Plaintiff and Class Members were the foreseeable and probable victims of Instructure's failure to implement and maintain adequate data security practices and procedures.

118. Despite being aware of or disregarding the risk of cyberattacks and the inadequacy of its own systems, Instructure failed to implement and maintain adequate data security practices, resulting in the compromise and exposure of Plaintiff's and Class Members' PII in the Data Breach.

119. Instructure failed to heed industry warnings and alerts to implement adequate data security safeguards to protect Plaintiff's and Class Members' PII.

120. Instructure has admitted that Plaintiff's and Class Members' PII was accessed and exfiltrated by unauthorized third parties in the Data Breach.

121. Instructure has further admitted the specific vector exploited in the Data Breach: in a public statement, Instructure conceded that "the unauthorized actor exploited an issue related to our Free-For-Teacher accounts," and was forced to shut that program down to restore service, as alleged above. That admission confirms that Instructure's failure to adequately secure or restrict its Free-For-Teacher account program—a free account offering open to any purported teacher worldwide and integrated into the same platform that hosts students' PII—was a direct cause of the Data Breach.

122. Instructure had and continues to have a duty to disclose when PII stored on its systems or networks is compromised, including what data was compromised, how, and when, so that Plaintiff and Class Members can take steps to prevent, mitigate, and remediate identity theft or fraudulent misuse of their PII.

123. Instructure breached its duties to Plaintiff and Class Members by failing to use reasonable measures to protect their PII. The specific negligent acts and omissions committed by Instructure include, but are not limited to:

    a.    Failing to adopt, implement, and maintain adequate and industry-standard data security protocols to protect and safeguard Plaintiff's and Class Members' PII;

    b.    Failing to adequately monitor the security of its networks and systems;

    c.    Failing to audit, monitor, and ensure the integrity of its vendors' data security practices;

    d.    Failing to detect and prevent unauthorized access to Plaintiff's and Class Members' PII;

e.  Failing to remove or delete PII it was no longer required to retain pursuant to regulations; and

f.  Failing to ensure that vendors entrusted with Plaintiff's and Class Members' PII exercised appropriate practices to remove or delete that data when no longer needed for authorized purposes.

124. Instructure's failure to exercise reasonable care in safeguarding that information by adopting, implementing, and maintaining appropriate data security measures directly and proximately caused the access and theft of Plaintiff's and Class Members' PII in the Data Breach.

125. As a direct and proximate result of Instructure's negligence, Plaintiff and Class Members have suffered and will continue to suffer the injuries described above, including fraud-related risk, mitigation costs, lost time, loss of control over their PII, diminution in value of their PII, and overpayment for services received without adequate data security.

126. Plaintiff and Class Members have a present and continuing interest in the security of their PII, which upon information and belief remains in Instructure's possession and is subject to further unauthorized disclosures so long as Instructure fails to undertake appropriate and adequate measures to protect the PII in its custody.

127. As a direct and proximate result of Instructure's negligence, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT II

### NEGLIGENCE PER SE

128. Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 103 as if fully set forth herein.

129. Instructure solicited, collected, stored, and maintained Plaintiff's and Class Members' PII as part of its regular business activities, which affect commerce.

36

130.    Section 5 of the FTC Act, COPPA, FERPA, industry standards, and the various state consumer protection statutes discussed herein are independent sources of Instructure's duty to use reasonable data security measures to protect Plaintiff's and Class Members' PII.

131.    The relevant requirements imposed by Section 5 of the FTC Act, COPPA, FERPA, industry standards, and state statutory law inform Instructure's duty of care.

132.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Instructure, of failing to employ reasonable measures to protect and secure sensitive consumer data. The FTC publications and orders described herein also form part of the basis of Instructure's duty in this regard.

133.    Instructure violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and by not complying with applicable industry standards as described herein. Instructure's conduct was particularly unreasonable given the nature and amount of PII Instructure had collected and stored and the foreseeable consequence of a data breach, including, specifically, the immense damage that would result to individuals, including minors, in the foreseeable event of a breach, which ultimately came to pass.

134.    Further, pursuant to COPPA, 15 U.S.C. § 312.10, Instructure had a "mandate[d]" duty to only "retain children's personal information 'for only as long as is reasonably necessary to fulfill the purpose for which the information was collected,'" and thereafter had a duty to "delete [children's personal information] using reasonable measures to ensure it's been securely destroyed" even absent a parent's request for the deletion of a child's personal information."

135.    Instructure violated COPPA § 312.10 by failing to use reasonable measures to protect PII and by not complying with industry standards.

136.    Additionally, pursuant to FERPA, *see* 20 U.S.C. § 1232(g); 34 CFR Part 99—a federal law aimed at protecting the privacy of student education records that applies to schools and other educational institutions that receive federal funds—Instructure had a duty to adopt reasonable measures to protect certain sensitive student records from being disclosed without the student's consent or knowledge.

137.    Instructure violated FERPA by failing to adopt reasonable measures to protect the PII it collected, which included the confidential student records of Plaintiff and Class Members, from unauthorized access or disclosure to third parties.

138.    Instructure's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because basic industry standards require Instructure to protect such confidential PII.

139.    Instructure breached its duty to secure and safeguard Plaintiff's and Class Members' PII by violating statutory laws, along with industry standards, that required it to implement and maintain adequate data security to safeguard consumers' personal information.

140.    The harm that has occurred as a result of Instructure's conduct is the type of harm that the FTC Act, COPPA, FERPA, industry standards, and state consumer protection statutes were intended to guard against.

141.    Indeed, the FTC has pursued numerous enforcement actions against businesses, like Instructure, that, as a result of their failure to employ reasonable data security measures, caused the same types of harm suffered by Plaintiff and Class Members as a result of the Data Breach.

142.    It was reasonably foreseeable to Instructure that its failure to implement and maintain adequate data security practices to safeguard and protect Plaintiff's and Class Members' PII would result in the improper access and disclosure of that sensitive information to unauthorized third parties.

143.    Instructure's conduct is especially egregious given the nature and amount of the PII it solicits, collects, stores, and maintains, including on behalf of a large and vulnerable population of minors and children, and given the substantial damages a data breach would foreseeably cause Plaintiff and Class Members.

144.    Had Plaintiff and Class Members known that Instructure did not adequately protect their PII, Plaintiff and Class Members would not have entrusted Instructure with their PII.

145.    But for Instructure's wrongful and negligent breach of its duties, Plaintiff and Class Members would not have been injured.

146.    Instructure's various violations and its failure to comply with applicable laws, including but not limited to Section 5 of the FTC Act, COPPA, FERPA, industry standards, and state consumer protection statutes, constitute negligence *per se*.

147.    As a direct and proximate result of Instructure's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer injuries and damages including fraud-related harm, loss of privacy and confidentiality, compromise or publication of their PII, mitigation expenses, out-of-pocket costs, lost time, diminished value of the services they paid for, and a continuing risk of further unauthorized disclosure while Instructure retains their data without adequate safeguards.

148.    As a direct and proximate result of Instructure's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury or harm, including,

39

but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses. Moreover, injuries-in-fact and damages are ongoing, present, and continuing.

149.    As a direct and proximate result of Instructure's negligence *per se*, Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages, in an amount to be proven at trial.

150.    Plaintiff and Class Members are also entitled to injunctive relief requiring Instructure to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit and identity and other monitoring services to Plaintiff and Class Members.

**COUNT III**

**INVASION OF PRIVACY/INTRUSION UPON SECLUSION**

151.    Plaintiff repeats and realleges all factual allegations contained in paragraphs 1 through 103 as if fully set forth herein.

152.    Plaintiff and Class Members have a legitimate expectation of privacy in their PII and private messages, and they are entitled to the protection of that information against improper access and disclosure to unauthorized third parties.

153.    As alleged above, Instructure owed a duty to Plaintiff and Class Members to keep their PII and private messages secure and confidential.

154.    Instructure failed, however, to implement and maintain adequate data security practices to secure and protect Plaintiff's and Class Members' PII and private messages from unauthorized access and disclosure.

155.    By failing to adequately protect Plaintiff's and Class Members' PII and private messages, Instructure allowed unauthorized and unknown third parties, the extortion group ShinyHunters, to access and obtain Plaintiff's and Class Members' private and confidential data

and messages and to publish them or threaten to publish them, including through messages displayed on the Canvas platform itself.

156. The unauthorized access and disclosure of Plaintiff's and Class Members' PII and private messages is highly offensive to a reasonable person.

157. Instructure invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing or disclosing their PII and private messages without their informed, voluntary, affirmative, and clear consent.

158. Plaintiff and Class Members entrusted their PII and private messages to Instructure in order to use Instructure's services, at the behest of their educational institutions, but they did so privately, with the intention, mutual understanding, and reasonable expectation that their PII and private messages would be kept confidential and protected from unauthorized access and disclosure.

159. Plaintiff and Class Members reasonably expected the PII and private messages they entrusted to Instructure would be kept private and would not be disclosed without their authorization.

160. Instructure's inadequate data security practices, policies, and procedures, including vendor management, and the resulting Data Breach, constitute intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

161. Instructure acted with a knowing state of mind when it permitted the Data Breach to occur because it knew or should have known that its or its vendors' data security practices were inadequate.

162. Past breaches in the edtech industry put Instructure on clear notice that its data security practices were inadequate to safeguard Plaintiff's and Class Members' PII and private messages, and Instructure knew or should have known that the risk of a data breach was highly likely.

163. Plaintiff and Class Members were the foreseeable and probable victims of Instructure's failure to implement and maintain adequate data security practices and procedures.

164. By intentionally failing to keep Plaintiff's and Class Members' PII and private messages safe, and by intentionally misusing or disclosing said information to unauthorized parties, Instructure intentionally invaded Plaintiff's and Class Members' privacy by:

    a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

    b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

    c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

165. Instructure knew or reasonably should have known that an ordinary person in Plaintiff's or Class Members' position would consider Instructure's intentional actions highly offensive and objectionable.

166. As a direct and proximate result of the above acts and omissions, Plaintiff's and Class Members' PII and private messages were disclosed to third parties without their authorization, causing Plaintiff and Class Members to suffer damages.

167. Instructure's unlawful invasions of privacy damaged Plaintiff and Class Members, as alleged herein. Among other things, Plaintiff and Class Members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated.

168. Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, as well as injunctive relief.

## COUNT IV

## DECLARATORY JUDGMENT
### (28 U.S.C. § 2201)

169. Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 103 as if fully set forth herein.

170. Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

171. As previously alleged, Instructure owes a duty of care to Plaintiff and Class Members to adequately secure and protect Plaintiff's and Class Members' PII from unauthorized access and disclosure.

172. Upon information and belief, Instructure still possesses Plaintiff's and Class Members' PII.

173. Instructure failed to fulfill its contractual and legal duties to secure and safeguard Plaintiff's and Class Members' PII.

174. As described herein, Plaintiff has suffered actual harm in the wake of the Data Breach. Plaintiff and Class Members are also at risk of additional or further harm due to the exposure of their PII and Instructure's failure to address the data security failings that led to such exposure.

175. Since the Data Breach, Instructure has not announced any adequate changes to its data security infrastructure, processes, or procedure to remedy the vulnerabilities or deficiencies, including vendor management, that permitted the Data Breach to occur and go undetected, and, thereby, prevent future attacks.

176. There is no reason to believe Instructure's employee training and security measures are any more adequate now than they were before the Data Breach.

177. In fact, now that Instructure's inadequate data security or security monitoring of vendors is known to hackers, PII in Instructure's possession is even more vulnerable to cyberattacks, as evidenced by the history of this Data Breach, itself a repeat attack by ShinyHunters.

178. The May 7 Attack confirms the inadequacy of Instructure's response. As alleged above, on May 7, 2026—only days after Instructure publicly disclosed the Data Breach— ShinyHunters again breached Instructure's systems, defacing Canvas login pages with the message that "ShinyHunters has breached Instructure (again)" and that, "Instead of contacting us to resolve it[,] they ignored us and did some 'security patches.'" Instructure was forced to put Canvas, Canvas Beta, and Canvas Test into "maintenance mode," knocking the platform offline for hundreds of thousands of students nationwide during finals periods. The recurrence of the very same threat actor exploiting Instructure's systems within days of the Data Breach is direct evidence that Instructure's purported remediation efforts have been inadequate and that the risk of further unauthorized access to Plaintiff's and Class Members' PII is ongoing, imminent, and substantial, making prospective declaratory and injunctive relief necessary and appropriate.

179. Plaintiff and Class Members, therefore, seek a declaration that: (a) Instructure's existing data security and vendor management measures do not comply with its contractual obligations and duties of care to adequately secure Plaintiff's and Class Members' PII; and (b) to comply with its contractual obligations and duties of care, Instructure must implement and maintain reasonable data security measures, including, but not limited to:

    a.    Engaging internal security personnel to conduct testing, including audits of Instructure's and its vendors' systems on a periodic basis, and promptly

correcting any problems or issues detected by such internal security auditors;

b.   Engaging third-party security auditors to run automated security monitoring of Instructure's or its vendors' computer networks;

c.   Auditing, testing, and training their and their vendors' security personnel and employees regarding any new or modified data security policies and procedures;

d.   Purging, deleting, and destroying, in a reasonably secure manner, any PII not necessary for Instructure's or its vendors' provision of services;

e.   Conducting regular database scanning and security checks;

f.   Implementing mechanisms, procedures, and vendor management policies to adequately oversee the data security of any companies Instructure contracts with and to which it entrusts highly sensitive personal information, including but not limited to, Plaintiff's and Class Members' PII; and

g.   Routinely and continually conducting internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, Plaintiff's and Class Members' PII.

**COUNT V**

**BREACH OF IMPLIED CONTRACT**

180.   Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 103 as if fully set forth herein.

181.   Plaintiff brings this claim on behalf of herself and all Class Members who provided their PII to Instructure.

182.   When Plaintiff and Class Members entrusted Instructure with their PII, either directly or through their educational institution, they did so with the reasonable expectation that Instructure would protect their highly sensitive and confidential data from unauthorized access and disclosure—and Instructure knew that.

183.    Plaintiff and Class Members were required to provide their PII to Instructure in exchange for receiving Instructure's products and services, which were necessary to their studies or to their role as an employee of an educational institution.

184.    Instructure solicited and accepted possession of Plaintiff's and Class Members' PII for the purpose of providing products and services to Plaintiff and Class Members.

185.    In connection with receiving those products and services, Plaintiff and Class Members entered into implied contracts with Instructure.

186.    Pursuant to the implied contracts, Plaintiff and Class Members paid money to their learning institutions, who in turn paid Instructure for the provision of products and services, and entrusted Instructure with their PII. In exchange, Instructure implicitly agreed to secure and protect the PII they required Plaintiff and Class Members to provide.

187.    Plaintiff, Class Members, and Instructure had a mutual understanding that Instructure would implement and maintain adequate and reasonable data security practices and procedures to protect Plaintiff's and Class Members' PII. Plaintiff, Class Members, and Instructure also shared an expectation and understanding that Instructure would not share or disclose, whether intentionally or unintentionally, the sensitive PII in its possession and control, and would ensure that its vendors would not share or disclose the PII in its vendors' possession and control.

188.    Pursuant to the implied contracts, Instructure agreed to, and Plaintiff and Class Members mutually understood and reasonably expected that Instructure would, among other things: (a) provide products and services to Plaintiff and Class Members; (b) take reasonable and legally and contractually required measures to protect the security and confidentiality of Plaintiff's and Class Members' PII; (c) take reasonable and legally and contractually required steps to ensure that access to the PII in the possession and control of Instructure and its vendors was restricted and

46

limited to achieve its intended purpose, in compliance with federal and state laws and regulations governing education records and personal information of minors, among other requirements; (d) restrict access to qualified and trained agents and vendors; (e) design and implement appropriate retention policies to protect the PII from unauthorized access and disclosure; (f) require proper encryption of the PII, including PII shared with its vendors and agents; (g) require multifactor authentication for access to the PII; and (h) otherwise protect Plaintiff's and Class Members' PII in compliance with federal and state laws, regulations, and industry standards.

189.    The protection of Plaintiff's and Class Members' PII was a material term of the implied contracts between Plaintiff and Class Members and Instructure.

190.    Indeed, Instructure knew data security was an important factor in Plaintiff's and Class Members' decision to entrust Instructure with their PII.

191.    Instructure's public statements proclaiming its commitment to data security, and the promises contained in its respective privacy and COPPA policies, indicate Instructure understood its obligation to secure and safeguard Plaintiff's and Class Members' PII.

192.    Plaintiff and Class Members never would have entrusted Instructure with their PII without an implicit assurance the information would be protected.

193.    Had Plaintiff and Class Members known Instructure would not adequately protect their PII, they would not have sought products and services from Instructure, nor would they have entrusted their PII to Instructure.

194.    Plaintiff and Class Members fully performed their obligations under the implied contracts when they provided Instructure with their PII.

195.    The products and services Instructure provided to Plaintiff and Class Members, which required Plaintiff and Class Members to entrust Instructure with their PII, were rendered in

such a manner as to reflect the mutual understanding that Instructure would adequately secure and protect Plaintiff's and Class Members' PII.

196. When Instructure required Plaintiff and Class Members to entrust it with their PII in order to receive Instructure's products and services, Instructure by its conduct manifested a mutual understanding of an implied contract to safeguard that PII.

197. Instructure breached its obligations under the implied contracts with Plaintiff and Class Members by failing to, or contracting with vendors who failed to, implement and maintain reasonable data security measures to protect and secure Plaintiff's and Class Members' PII, including failing to ensure companies it contracts with implement and maintain reasonable security measures to protect PII.

198. As a direct and proximate result of Instructure's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including foreseeable and consequential damages.

199. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

**COUNT VI**

**UNJUST ENRICHMENT/QUASI-CONTRACT FOR RESTITUTION**

200. Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 104 if fully set forth herein.

201. Plaintiff brings this claim in the alternative to breach of implied contract.

202. Plaintiff brings this claim on behalf of herself and all Class Members who provided their PII to Instructure.

203.    Instructure knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on data security at the expense and to the detriment of Plaintiff and Class Members.

204.    Plaintiff and Class Members conferred a monetary benefit upon Instructure in the form of monies paid to their education institutions, who in turn paid Instructure for products and services.

205.    Plaintiff and Class Members also conferred a benefit upon Instructure through the provision of their PII, which has monetary value, and from which Instructure derives its business.

206.    Instructure solicited, collected, stored, and maintained Plaintiff's and Class Members' PII, and as such, Instructure accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Instructure profited from these transactions and used Plaintiff's and Class Members' PII for business purposes.

207.    There is a direct nexus between the money paid to Instructure and the requirement that Instructure keep Plaintiff's and Class Members' PII confidential and protected from unauthorized access and disclosure because data security was an integral part of the products and services Plaintiff's and Class Members' education institutions paid for.

208.    When Plaintiff and Class Members provided their PII to Instructure, they did so with the mutual understanding and reasonable expectation that Instructure would adequately secure and protect their sensitive data from unauthorized access and disclosure.

209.    Plaintiff and Class Members therefore intended a portion of their payments to fund a reasonable level of data security, and Instructure knows the amount of each payment allocated to data security.

210. Upon information and belief, Instructure funds its data security measures entirely from its general revenue.

211. Protecting Plaintiff's and Class Members' PII is integral to Instructure's business. Without Plaintiff's and Class Members' private data, Instructure would be unable to provide the products and services comprising its core businesses.

212. Instead of providing a reasonable level of data security that would have prevented the Data Breach, however, Instructure calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures, and not vetting and monitoring its vendors' compliance with data security rules and regulations.

213. Instructure cut data security costs and failed to take known and available steps to secure and safeguard Plaintiff's and Class Members' PII.

214. Instructure therefore enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

215. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Instructure's decision to prioritize its own profits over the requisite data security.

216. Under the principles of equity and good conscience, Instructure should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members, because Instructure failed to implement appropriate data and vendor management and security measures.

217. Instructure should not be permitted to retain the money belonging to Plaintiff and Class Members because Instructure failed to adequately provide the data security that Plaintiff and Class Members paid for and otherwise mandated by federal, state, and local laws and industry standards.

218. Plaintiff and Class Members have no adequate remedy at law.

219. It would be inequitable and unconscionable to permit Instructure to retain funds it saved by shirking proper data security and leaving Plaintiff and Class Members to suffer the consequences.

220. Instructure should therefore be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, all gains it unjustly received.

## COUNT VII

**MISSISSIPPI CONSUMER PROTECTION ACT, MISS. CODE §§ 75-24-1, ET SEQ. (ON BEHALF OF PLAINTIFF CIARA BROWN AND THE MISSISSIPPI SUBCLASS)**

221. Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 104 if fully set forth herein.

222. This claim is brought by Plaintiff on behalf of herself and all Mississippi Subclass Members who provided their PII to Instructure.

223. Instructure is a "person" as defined by Miss. Code § 75-24-3.

224. Instructure advertised, offered, or sold goods or services in Mississippi and engaged in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

225. Instructure engaged in unfair and deceptive trade acts or practices, including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Mississippi Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Mississippi Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Mississippi Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Mississippi Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Mississippi Subclass Members' PII; and

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Mississippi Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

226.   The above-described conduct violated Miss. Code Ann. § 75-24-5(2), including:

a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

b.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

c.   Advertising goods or services with intent not to sell them as advertised.

227.   Instructure intended to mislead Plaintiff and Mississippi Subclass Members and induce them to rely on its misrepresentations and omissions.

228.   Instructure's misrepresentations and omissions were material because they were likely to deceive Plaintiff and Class Members about the adequacy of its data security and ability to protect the confidentiality of consumers' PII.

229.   Had Instructure disclosed to Plaintiff and Mississippi Subclass Members that its data systems were not secure and were vulnerable to attack, Instructure would have been forced to adopt reasonable data security measures and comply with the law. Instead, Instructure received, maintained, and compiled Plaintiff's and Mississippi Subclass Members' PII as part of the services

it provided, and for which Plaintiff and Mississippi Subclass Members paid, without advising them that Instructure's data security practices were insufficient to maintain the safety and confidentiality of their PII. Accordingly, Plaintiff and the Mississippi Subclass Members reasonably relied on Instructure's misrepresentations and omissions, the truth of which they could not have discovered.

230.    Instructure had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extensiveness of the PII in its possession. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff and the Mississippi Subclass—and Instructure because consumers cannot fully protect their interests regarding their data and placed trust and confidence in Instructure. Instructure's duty to disclose also arose from its:

a.    Possession of exclusive knowledge regarding the security of the data in its systems;

b.    Active concealment of the state of its security; and

c.    Incomplete representations about the security and integrity of its computer and data systems and its prior data breaches while purposefully withholding material facts from Plaintiff and the Mississippi Subclass that contradicted these representations.

231.    Instructure acted intentionally, knowingly, and maliciously to violate Mississippi's Consumer Protection Act and recklessly disregarded Plaintiff and Mississippi Subclass Members' rights. Instructure (1) represented in its information privacy and confidentiality policies that it was implementing reasonable security measures to protect Plaintiff's and Class Members' sensitive personal information and (2) failed to implement reasonable data security measures, including reducing and outsourcing cybersecurity personnel, despite being on notice that its data security and privacy protections were inadequate.

232.    As a direct and proximate result of Instructure's unfair and deceptive acts or practices and Plaintiff's and Mississippi Subclass Members' purchase of goods or services

primarily for personal, family, or household purposes, Plaintiff and Mississippi Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Instructure because they would not have paid Instructure for goods and services, or would have paid less for them, absent Instructure's alleged violations; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased risk of fraud and identity theft.

233. Instructure's violations present a continuing risk to Plaintiff and Mississippi Subclass Members as well as to the general public.

234. Plaintiff and Mississippi Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution and other relief under Miss. Code § 75-24-11, injunctive relief, punitive damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that this Court:

A. Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B. Order appropriate compensatory, injunctive, equitable, declaratory, punitive, and nominal relief to Plaintiff and Class Members under applicable law;

C. Award Plaintiff an appropriate Class representative service award for her prosecution of this matter on behalf of all Class Members;

D. Award Plaintiff and the Class pre-judgment and post-judgment interest as prescribed by law;

E. Award reasonable attorneys' fees and costs as permitted by law; and

F.      Enter other and further relief as the Court deems to be both just and fair.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for any and all issues in this action so triable as of right.

Dated: May 8, 2026

Respectfully submitted,

By: */s/ Jason L. Lichtman*
Jason L. Lichtman, Bar No. 18770
Michael J. Miarmi*
Sean A. Petterson*
John D. Maher*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Tel.: (212) 355-9500
Fax: (212) 355-9592
Email: jlichtman@lchb.com
Email: mmiarmi@lchb.com
Email: spetterson@lchb.com
Email: jmaher@lchb.com

**HAUSFELD LLP**

Steven M. Nathan*
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: snathan@hausfeld.com

James J. Pizzirusso*
Kira Hessekiel*
Carlynne Wagner*
1200 17th Street, N.W., Suite 600
Washington, D.C. 20036
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: jpizzirusso@hausfeld.com
Email: khessekiel@hausfeld.com
Email: cwagner@hausfeld.com

***Pro Hac Vice Forthcoming***

ATTORNEYS FOR PLAINTIFF

55

CIARA BROWN